NEPTUNE METER CO. et al. v. NATIONAL METER CO.

(Circuit Court of Appeals, Third Circuit. January 28, 1904.)

No. 16.

1. PATENTS—INVENTION—WATER-METERS.

The Nash patent, No. 433,088, for a water-meter, claims 14 and 15, covering the feature of making one head of the case weak at some point, relatively to the other parts of the chamber, either by making it thinner throughout, or by making an annular groove therein, so that it will yield in case of excessive interior pressure due to freezing, are void for lack of invention, in view of the prior patents to Tabor for a cylinder head for steam engines similarly weakened by means of a groove, and the two prior Tracy patents for a safety device for hot-water boilers for house use, expressly designed to relieve against internal pressure from either steam or freezing; the Nash device being merely the application of the same principle and expedient in the old way to accomplish the old result.

Appeal from the Circuit Court of the United States for the District of New Jersey.

For opinion below, see 122 Fed. 75.

William A. Redding and Frederic H. Betts, for appellants.

J. Edgar Bull and Edmund Wetmore, for appellee.

Before ACHESON and GRAY, Circuit Judges, and McPHERSON, District Judge.

ACHESON, Circuit Judge. In the court below, the complainant was the National Meter Company; the defendants were the Neptune Meter Company, and its president and other principal officers, who are the appellants. The bill charged the defendants with infringement of letters patent for improvements in water-meters with revolving pistons, No. 433,088, dated July 29, 1890, granted to the National Meter Company as assignee of Lewis Hallock Nash, the inventor. The main invention described and shown in the elaborate specification and the accompanying sixteen drawings "relates to water-meters in which a case contains an interior fixed abutment having alternate projections and recesses or corrugations, and a piston provided with alternate projections and recesses or corrugations, which coact with the corrugations on the abutment to form a plurality of enlarging and contracting measuring-spaces." The patent contains no less than thirty-three claims, but infringement of only two of the claims—the fourteenth and fifteenth—is alleged. Those two claims (and only those two) were based upon the following paragraph of the specification:

"Another important feature of my invention is a provision by which the meter is prevented from being damaged by freezing. For this purpose, I form the upper head of the case so that it shall be very much weaker in thickness at some point, as at u, u, than the body of the case; it being, however, made amply strong to sustain the ordinary pressure of the water to which it will be subjected in actual use, but not strong enough to sustain the pressure due to the freezing in the case. The body of the case is, however, made very strong, so that when the water freezes in the meter the case will not be injured, but the upper head will yield with the pressure of the ice, and thus prevent all excessive strain upon the case. In order to accomplish this without danger of the case-head changing its form under the water-pressure and from other causes, I prefer to make the head of sufficient thickness, and then to form a groove, u, around that portion of the head which it is desired to have yield to the freezing-pressure. In this way I form a case-head which will keep its shape under all ordinary conditions of pressure, but which will yield readily to excessive pressure before the case is in danger of being destroyed. The same effect can be accomplished by making the upper head of uniform thinness, but, for the reasons given, I prefer to form it of unequal thickness."

The two claims alleged by the bill to have been infringed by the defendants read as follows:

"(14) The combination, with a water-meter having its chamber-forming case made relatively strong, of an inclosing head therefor made relatively weak, whereby to form a yielding part against undue interior pressure.

"(15) The cover or inclosing-head of a water-meter case having a groove or surface recess to reduce the thickness of the inclosing head over the measuring-chamber, substantially as described, and for the purpose stated."

The paragraph quoted above contains all that is disclosed or stated in the specification in regard to the subject-matter of claims 14 and

15. Only one of the sixteen drawings (Fig. 1) illustrates this feature of the invention, and it shows an annular groove, u, formed in the upper surface of the upper head of the casing which incloses the working parts of the meter.

Now, by the proofs in this case, it appears that, before the making of the improvements which are the subject of the patent in suit, it was old to provide an inclosed chamber with a weakened head which will blow out or yield under excessive interior pressure, so as to prevent the destruction of other parts; and it was old to weaken the inclosing-head by making a groove or recess in its surface. All this is found in letters patent No. 303,070, dated August 5, 1884, granted to Harris Tabor. In his specification, Tabor states that:

"The object of my invention is to enable the relief of overpressure induced in the cylinder of a steam or other engine by an accumulation of water therein to be effected without substantial damage to the cylinder or other members of the engine; and, to this end, my improvement consists in the combination, with a cylinder-head of a relief plate, an outer casing, and a connecting-bolt, as hereinafter more fully set forth."

After speaking of the dangerous results often incident to the accumulation of water in the cylinder of an engine, and the desirability of preventing such accidents and of reducing their injurious effects, the Tabor specification proceeds thus:

"My invention is designed to comply with the requirement last stated by providing a member whose capacity of resistance, while sufficient to sustain the maximum pressure which may be normally and safely exerted in the cylinder, is so limited relatively to that of other members subject to equal strain as to insure its fracture before the attainment of a sufficiently high degree of pressure to effect damage to other parts, and which, when broken, can be quickly and cheaply replaced."

In the Tabor construction, as described in the specification and shown by the drawings of the patent, the inclosing head of the cylinder is provided with a relief-plate secured against a shoulder in the head, and in the plate is formed an annular groove or recess, a'. This groove or recess, the specification states, is of such depth—

"As to reduce the strength of the relief-plate to such degree as shall be proper to sustain a determined pressure greater than the maximum working-pressure under which the engine is designed to operate, and less than that which would be sufficient to cause damage to other parts in the event of breakage. The relief-plate will consequently remain intact so long as the normal working-pressure, or any safe addition thereto, is not exceeded; but, upon the exertion of internal pressure in excess of the limit of resistance which it is constructed to afford, it will fracture through the groove, a, and relieve such excess of pressure, without injurious effect, other than causing a brief stoppage of the engine for the insertion of a new plate."

Tabor applied the described expedient to the cylinder of a "steam or other engine." Nash applied it to a water-meter. In both instances, however, relief from the injurious effect of undue interior pressure is the object sought, and in each case it is accomplished by the same means, viz., by a weakened inclosing-head, which will yield to the internal pressure, and in each instance an annular groove or recess is formed in the inclosing-head to weaken it.

Tabor's specification, indeed, does not note as one of the causes of excessive interior pressure the freezing of the accumulated water; but,

if this lack of express mention is of any moment, the omission was supplied by two patents granted to William A. Tracy, to wit, No. 303,-765, dated August 19, 1884, and No. 329,509, dated November 3, 1885, both of which antedate Nash. Each of the Tracy patents is for a safety device for boilers, to relieve against excessive internal pressure, from whatever cause, and, specifically, from freezing water. The specification of the earlier of the Tracy patents states that the invention "has reference to hot-water boilers for house use, and it consists in providing the same with suitable means to allow of its being cleaned without removal, and prevent its destruction should steam accumulate or the water therein freeze." After mention of the danger due to the accumulation of steam in the boiler, and the statement, "If the water freezes within the boiler, the expansion which takes place bursts out the heads," the specification proceeds to say that the invention set forth in the patent will "automatically allow of relief if an excessive pressure is created within said boiler." The safety device shown by this patent consists of a plate which covers a large opening in the head of the boiler, which plate is secured to the head by weak bolts—intentionally made weak, so that they will give way at a less pressure than would damage the other parts of the boiler. The specification states that, "should steam accumulate sufficiently to endanger the boiler, or the water freeze, the plate or cover is blown off, destroying the bolts, J, which are purposely and designedly made much weaker than other parts of the boiler." The single claim of this patent is as follows:

"A hot-water boiler for house use, combined with a relief device consisting of a cap or cover arranged to fit over a large aperture or inlet to said boiler near the bottom, and held in place, forming a water-tight joint, by means of weak bolts and nuts, which are designedly made of such a strength as to give way before the boiler could burst from the production of steam or ice, substantially as and for the purpose specified."

The later Tracy patent shows a hand or cleaning hole in the head of the boiler, over which a cap or plate is clamped without the use of bolts, and which plate is weakened by a groove, "preferably ring-shaped," formed in it, so that the weakened portion will blow out or yield under excessive interior pressure. The specification of this patent states that the object of the invention—

"Is to provide one of the cast-iron heads with a portion which shall be sufficiently weak, that, should the boiler, from any cause, have to sustain a greater pressure than intended, the said portion will be blown out without injury to the remaining parts of the boiler, and this weakened portion is preferably formed in a removable cap or plate which covers a hand-hole, through which the boiler may be cleaned when desired; and when said cap, with its weakened portion, becomes broken, a new cap can be readily attached, and the boiler, as an entirety, be quickly put in working condition again. This cap or plate may be located wherever desired, but preferably upon one of the boiler-heads, and its position may be such that when projected by the force of the steam or freezing water, as the case may be, it shall pass in a direction not liable to injure any one in the room."

This specification contains this further statement:

"If the steam or freezing water would produce a pressure as to break the said cap at weakened portion, F, the discharge of the water would take place through the aperture so made without otherwise injuring the boiler. This

weakened part, F, might be made in the head, B, itself, as indicated in dotted lines in Fig. 1, if so desired, or might be formed in a cap of any other description. Therefore, while I prefer the construction shown, I do not limit myself thereto, as it may be modified in various ways without departing from my invention."

In view of the disclosures of the Tabor and two Tracy patents, did it involve invention on the part of Nash to apply to a water-meter the expedient of a weakened head to obviate the danger from excessive interior pressure due to freezing? We think not. Those prior patents disclosed the principle involved in the remedy, and the method of its practical application. Nash was not even the first to discern that the expedient was available to avert the danger from excessive pressure caused by the freezing of water in an inclosed chamber. Tracy had made that precise application. Nash merely applied an old expedient, in an old way, to accomplish an old result.

Now, it is a familiar proposition of law, recognized and enforced in a multitude of cases, "that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated." Pennsylvania Railroad Co. v. Locomotive Trust Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222; Morris v. McMillin, 112 U. S. 244, 5 Sup. Ct. 218, 28 L. Ed. 702; Blake v. San Francisco, 113 U. S. 679, 5 Sup. Ct. 692, 28 L. Ed. 1070; St. Germain v. Brunswick, 135 U. S. 227, 10 Sup. Ct. 822, 34 L. Ed. 122; Gates Ironworks v. Fraser, 153 U. S. 332, 14 Sup. Ct. 883, 38 L. Ed. 734. In Blake v. San Francisco, supra, after restating the above rule, the court, speaking by Mr. Justice Woods, said:

"If there is any qualification of this rule, it is that, if a new and different result is obtained by a new application of an invention, such new application may be patented as an improvement on the original invention; but, if the result claimed as new is the same in character as the original result, it will not be deemed a new result for this purpose. For instance, an automatic relief valve, used to relieve the pressure of steam, produces no new result in character when used to relieve the pressure of water, unless some further effect besides the mere relief of pressure is obtained."

To avoid the anticipatory effect of the Tracy patents, it is contended that each of those patents shows only a comparatively small portion of the head so weakened as to yield under excessive interior pressure, whereas Nash contemplates the weakening of the whole inclosing-head, so that the entire head will yield. This argument rests altogether upon a mere theory advanced by the complainant's ingenious expert. The Nash patent itself, we think, gives no countenance to this theory. There is nothing whatever in his specification suggestive of the idea that the entire inclosing-head must be weakened so that the entire head will give way. On the contrary, Nash states in his specification, "For this purpose, I form the upper head so that it shall be very much weaker in thickness at some point, as at u, u, than the body of the case." And again he states in his specification, "I prefer to make the head of sufficient thickness, and then to form a groove, u, around that portion of the head which it is desired to have yield to the freezing pressure." Then the specification states that "the same effect can be accomplished

by making the upper head of uniform thinness, but, for the reasons given, I prefer to form it of unequal thickness." Undoubtedly, if. made of "uniform thinness," under excessive interior pressure, the head might break at any place or at several places. It is not suggested in the patent, nor is there any good reason for believing, that such a head would give way as an entirety. Neither of Nash's claims in question is limited in terms to an inclosing head weakened so that the entire head will yield. Those claims are broadly drawn, and, we think, with set purpose. Clearly, an inclosing head weakened at any point where it is desired to have the head yield to freezing pressure is within the terms of each of claims 14 and 15. Moreover, if it was an essential part of Nash's invention to so weaken the inclosing head that the entire head will yield, it was his duty under the statute to distinctly so state. The Incandescent Lamp Patent, 159 U. S. 465, 474, 16 Sup. Ct. 75, 40 L. Ed. 221; Chemical Rubber Co. v. Raymond Rubber Co., 39 U. S. App. 11, 71 Fed. 179, 18 C. C. A. 31.

But finally, in view of the prior patents to Tabor and to Tracy, it did not involve invention to weaken the entire inclosing head so that the whole head would yield under excessive interior pressure produced by freezing, instead of weakening a part of the inclosing head. Such a change would fall within the established principle that a mere carrying forward of an original conception patented; a new and more extended application of it, involving only change of form, proportions, or degree; the substitution of equivalents doing substantially the same thing in the same way, by substantially the same means, with better results—is not such invention as will sustain a patent. Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Burt v. Evory, 133 U. S. 349, 10 Sup. Ct. 394, 33 L. Ed. 647. Neither Tabor nor Tracy limited the space to be weakened. Tracy speaks of "a large aperture or inlet.". The increase of the size of the aperture was a matter of good judgment and of mechanical skill. We here quote, as apposite, the remarks of Mr. Justice Matthews, who, speaking for the court in Hollister v. Benedict, 113 U. S. 59, 73, 5 Sup. Ct. 717, 724, 28 L. Ed. 901, said that:

"A skilled mechanic, witnessing the performance of a machine inadequate by reason of some defect to accomplish the object for which it had been designed, by the application of his common knowledge and experience, perceives the reason of the failure, and applies what is obviously wanting. It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the faculty of manipulation which results from its habitual and intelligent practice, and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward."

The decree of the Circuit Court is reversed, with costs, and the cause is remanded to that court, with direction to enter a decree dismissing the bill, with costs.