## R. H. COMEY CO. v. MONTE CHRISTI CORPORATION et al.

(Circuit Court of Appeals, Third Circuit. March 2, 1927.)

No. 3503.

**1. Patents ⬤═118—Court will carefully appraise adequacy of disclosure, where chemists, skilled in art, could not practice invention therefrom.**

Where chemists, skilled in the art, could not practice invention of a patent from its disclosure, but were driven to experiments, courts will carefully appraise adequacy of disclosures and sustain or strike down patent accordingly, especially where it is claimed that the art is new.

**2. Patents ⬤═328—1,000,298, claims 1 and 2, for article in form of preparation for slowly liberating oxygen, held invalid for inadequate disclosure (Comp. St. § 9432).**

Sarason's patent, No. 1,000,298, claims 1 and 2, for an article in the form of a preparation for slowly liberating oxygen, held invalid, under Rev. St. § 4888 (Comp. St. § 9432), because of inadequate disclosure.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Patent infringement suit by the R. H. Comey Company against the Monte Christi Corporation and others. Decree of dismissal, and plaintiff appeals. Affirmed.

George Ramsey, of New York City, C. S. Grindle, of Washington, D. C., C. F. Chisholm, of New York City, and Wicoff & Lanning, of Trenton, N. J., for appellant.

William S. Gluck, J. T. Basseches, I. M. Obrieght, and Clair W. Fairbank, all of New York City, for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. In this suit for infringement, the trial court found the first and second claims of letters patent No. 1,000,298, issued August 8, 1911, to Leopold Sarason, and now owned by the plaintiff, invalid, and accordingly dismissed the bill. The plaintiff took this appeal. We shall confine our discussion to the issue of validity.

The patent is not for a process; it is for an article in the form of a "preparation for slowly liberating oxygen." The patent is so inartificially drawn that it has opened many avenues of discussion which the respective counsel have fully explored. Thus, while its title describes the invention as a preparation for slowly liberating oxygen, the specification says it is a preparation for safely keeping compounds which contain loosely combined oxygen. The opposing parties have traveled these opposite paths without definitely clearing them. We think, as the two objects are not incompatible, the inventor intended both, or, stated differently, the patent contemplates stabilizing oxygen wherever loosely combined. However, what the patentee said is this:

"As is well known, hydrogen peroxide, sodium peroxide, sodium perborate, sodium percarbonate, and analogous preparations, liberate their loosely combined oxygen very readily if they come in contact with catalytic agents. They thus decompose to some extent even during storage, since particles of dust and the walls of the storage vessels also act as catalytic substances. Also in their employment in medicine and hygiene, and in technical bleaching processes, premature and undesirable liberation of oxygen occurs, owing to the continual presence of catalytic substances."

Going on, the patentee said:

"I have ascertained, however, that by the addition of pyrophosphates of the alkalis (especially sodium pyrophosphate), the keeping quality of the above-mentioned substances, both in dry form and in solution, can be considerably increased, in such manner that they are altered in a much lower degree by catalytic agents than when without such additions. Pyrophosphates, furthermore, essentially increase the stability of said oxygen-containing substances against the influence of heat. By means of the present invention, therefore, a much better economic exploitation of the oxygen at disposal can be effected."

Having stated his knowledge of the art and the purpose of his invention, the patentee proceeded with his claims as follows:

"Claim 1. A preparation for slowly liberating oxygen, consisting of a compound containing loosely combined oxygen, and an alkali pyrophosphate."

Claim 2 differs from claim 1 in that it specifies sodium pyrophosphate as a particular alkali pyrophosphate.

In addition to the knowledge of the art stated in the patent, it was known that hydrogen peroxide, $H_2O_2$, which is nothing more than water, $H_2O$, oxygenated, contains the element of oxygen in loosely combined form, that is, one molecule of oxygen, under given catalytic influences, notably heat and light, is easily liberated, leaving nothing but plain water. Liberated oxygen is availed of for many purposes. It is used as a medicine; for instance, when hydrogen peroxide is poured on a wound, it rapidly decomposes on contact,

oxygen escapes in bubbles, and its curative and disinfecting effect is obtained. Loosely combined oxygen is also used to destroy coloring matter during bleaching of materials for industrial purposes, as in this case the bleaching of straw. It was also known that liberation of oxygen can be hastened or retarded. Substances used for either purpose are called catalysts, and these in turn are divided, according to their habit, into two classes—positive catalysts, which are decomposing agents, and negative catalysts which are preserving agents. It was still further known that alkalis are positive catalysts, which speed or promote decomposition of hydrogen peroxide, thus advancing its already fickle keeping qualities, and that acids are negative catalysts, which retard decomposition and thereby improve its keeping qualities.

Whether Sarason's object was to control the slow liberation of oxygen in medicinal and industrial uses, or merely to enhance its keeping qualities in one or the other, he employed as a definite element (disclosed in the second claim) sodium pyrophosphate, whose chemical formula is $Na_4P_2O_7$. This, we think, was new. That ingredient was one of a number embraced in the broad designation of the first claim "an alkali pyrophosphate," and is therefore an alkali, or a positive catalyst, and its use for either purpose would, on first view, seem a chemical paradox. The defendants maintain that it uses a sodium pyrophosphate which is acid, a negative catalyst, having the formula of $Na_2H_2P_2O_7$, and therefore avoids infringement. But for present purposes we shall accept the plaintiff's chemical explanation that the presence in the pyrophosphate of the sodium metal (an alkali) in both formulæ makes both pyrophosphates alkali, and shall, for the purposes of this discussion, refuse to follow the persuasive distinction made by the defendants. We thus deliberately bring the defendants' practice within the literalism of the claims of the patent in suit and of the specification with reference to the use of an alkali pyrophosphate in connection with hydrogen peroxide—two substances of the patent and the only two testified as having been found in the defendants' bleaching bath —and inquire what the patentee intended to accomplish by them when used together, how he taught their use, and what he actually accomplished.

Concededly, the intended object of the alleged invention is the stabilization of oxygen in compounds where it is loosely combined. To achieve that would, without doubt, be an advance in the chemical and especially in the medical and bleaching arts. As to how the thing can be done, the patentee was even more silent than Rohm (Rohm v. Martin Dennis Co. [C. C. A.] 263 F. 388), who, after satisfactorily pointing out a new bate for hides as the object of his invention, failed to disclose how his patented process could be practiced. He simply told of treatment of hides with an aqueous extract from the pancreas of animals; that is, he simply named a new fat decomposing ingredient, without giving proportions or other directions as to its composition. On licensing the invention, he gave the licensees personal instruction how to do it. That, we thought, he should have told the art, and, feeling that way, we held his patent invalid under R. S. § 4888 (Comp. Stat. § 9432), for want of that "full, clear, concise, and exact" disclosure which is the consideration for a patent monopoly. So in this case the patentee simply named an oxygen quieting substance. But the plaintiff says that the Rohm patent was for a process while his is for an article. That is true, but it is an article with identifying characteristics, namely, a "preparation * * * consisting of a compound containing loosely combined oxygen (in this case hydrogen peroxide) and sodium pyrophosphate." In other words, the patent sought to teach how fugitive oxygen in hydrogen peroxide can be controlled by a new use of an old chemical. The compound of these two claims certainly has these ingredients, but these compounded ingredients are not an invention entitling the one who thought of it to a patent, unless he show how the new preparation can be so compounded that it will do the thing the patent claims it will do, namely; slowly liberate oxygen or retard oxygen in its normal escape.

In a word, the patent describes the article, but it discloses no formula as to the proportions of its constituents and no way, technical or practical, of compounding them. True, the patent says, "A suitable preparation may be obtained by mixing, for instance, equal parts of sodium perborate ($Na_2B_4O_8+10\ H_2O$) and sodium pyrophosphate ($Na_4P_2O_7$);" but that is a solid compound falling under claim 4, not in suit. We are concerned with claims 1 and 2 in respect to the fluid bleaching agent of hydrogen peroxide. The patent gives no proportions of sodium pyrophosphate specifically or of "an alkali pyrophosphate" generally, and none is suggested whereby to obtain a product that will stabilize the more or less evanescent oxygen in hydrogen peroxide. What may be the proper proportions of the constituents of the article so to be employed

as a bleaching ingredient, the patentee left the art to hunt, and, if possible, to find. It may be the defendants succeeded; that has not been proved. Similarly, it may be the plaintiff succeeded; that, too, has not been proved, for the plaintiff's officers refused to tell. Some others in the art may have found them, but the evidence does not show it. So it was left to the experts for the respective parties to discover the proper proportions by experiments. Dr. McKee, the expert for the defendants, took hydrogen peroxide and sodium pyrophosphate, and, mixing them in varying proportions, obtained the startling result that the oxygen solution was not thereby made stable and the liberation of oxygen retarded, but that, in fact, the liberation of oxygen was accelerated, the sodium pyrophosphate (an alkali) acting as a positive catalyst, not as a negative catalyst. But the plaintiff says (and it says it in this court for the first time) that Dr. McKee experimented in a wrong way to test the invention, because the solution should have contained a positive catalyst in addition to the oxygen compound and in addition to the sodium pyrophosphate. There were present, we think, some catalysts which the patent contemplates as continually present, namely, heat in some measure, dust in some quantity, and chamber walls, all mentioned by the patent. But hydrogen peroxide is an alkali and is itself a catalyst, and we think the results of Dr. McKee's experiments and the way he made them show that one skilled in the art, such as he, could not, by following the patent, obtain the results promised.

[1] Dr. Beans, the plaintiff's expert, went about his experiments in his own way. He made a solution of hydrogen peroxide and sodium pyrophosphate in proportions of his own selection—3 per cent. hydrogen peroxide and 3 per cent. sodium pyrophosphate—and made it highly alkali by adding caustic soda, a powerful catalytic alkali of which the patent says nothing. Thus impregnated with caustic soda, the preparation did, he testified, have the effect of retarding the liberation of loosely combined oxygen; yet this is challenged with some force by the defendants. Dr. Beans' experiments with caustic soda carries the implication that without caustic soda the patented preparation would not produce the results claimed for it. Be that as it may, the action of these two chemists, both of unquestioned integrity, of high standing in their

science, and highly skilled in the art, shows that the patent did not tell them how to produce the product or its results. The expert for the defendants followed literally the terms of the patent (so far as given) and thereby obtained a result wholly opposite that which it proclaims; the expert for the plaintiff, not following the terms of the patent, but adding caustic soda, obtained the result which it declares. But whether caustic soda was the controlling agent we cannot say, for the patentee gave no indication that it should be an element of his preparation or that his preparation should be used in a solution containing that element. As we read the testimony of the two experts—and on their testimony this case must turn—we are not so much concerned as to which was right in his chemical tests as we are influenced by what to us is the demonstrated fact that both of these gentlemen had to experiment in practicing the supposed teaching of the patent. In other words, highly skilled chemists—that is, chemists whose skill in the art is no part of the invention and therefore does not have to be supplied or aided by the patent (Pittsburgh Iron & Steel Foundries' Co. v. Seaman-Sleeth Co. [C. C. A.] 248 F. 705, 706)—could not practice the invention of the patent from its disclosures. They were driven to experiments. When this is necessary, especially where, as here, it is claimed the art is new, courts will carefully appraise the adequacy of the disclosures and sustain or strike down the patent accordingly. Tyler v. Boston, 7 Wall. 327, 330, 19 L. Ed. 93; Consolidated Electric Light Co. v. McKeesport Light Co., 159 U. S. 465, 16 S. Ct. 75, 40 L. Ed. 221; Solva Co. v. Perkins Co., 251 F. 64, 69 (C. C. A. 7th); Rohm v. Martin-Dennis Co., 263 F. 388 (C. C. A. 3d).

[2] We are alert to the fact that the claimed invention is for an article, but the inventor has in his patent defined its identifying characteristics, chief of which is a definite result from the coaction of its ingredients. Searching for them with the aid of skilled experts, we have not been able to find them. It is evident, therefore, the patentee has not paid the price for a patent monopoly by conforming to R. S. § 4888, and making an adequate disclosure. Wood v. Underhill, 5 How. 1, 5, 12 L. Ed. 23.

The decree dismissing the bill because of invalidity of the claims of the patent in suit is affirmed.