PERKINS GLUE CO. v. SOLVA WATERPROOF GLUE CO. et al.

(District Court, N. D. Illinois, E. D.   June 19, 1915.)

No. 127.

1. PATENTS ⬥⇒328—VALIDITY AND INFRINGEMENT—STARCH GLUE.

The Perkins reissue patent, No. 13,436 (original No. 1,020,655), and the Perkins patent, No. 1,020,656, each for a proces of making starch glue and the resulting product, were not anticipated by patents or processes in use in the paste-making art, disclose invention, and are valid; also held infringed.

2. PATENTS ⬥⇒27—INVENTION—ADAPTATION TO NEW USE.

If an inventor finds a chemical substance devoted to a particular use, conceives the idea of applying it to a new purpose, and on experiment discovers that the substance must be treated in a particular way to suit his purpose, which method of treatment is essential to his end, but of less importance in obtaining the prior art results, he may be a real inventor, even though he selects a specific treatment in an occupied field.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 31, 32; Dec. Dig. ⬥⇒27.]

In Equity. Suit by the Perkins Glue Company against the Solva Waterproof Glue Company, the Burch-Kane Company, Lowell R. Burch, and Thomas B. Kane. On final hearing. Decree for complainant.

Brown, Hanson & Boettcher, of Chicago, Ill., and Wm. Houston Kenyon, Robert N. Kenyon, and Gorham Crosby, all of New York City, for complainant.

Rector, Hibben, Davis & Macauley, of Chicago, Ill., and Livingston Gifford, of New York City, for defendants.

SANBORN, District Judge.   [1] This is a suit for infringement of United States reissue letters patent No. 13,436 and United States original letters patent No. 1,020,656; the claims relied upon being Nos. 11, 13, 16, 19, 20, 24, 28, 30, 31, 32, 37 and 38 of the reissue patent and Nos. 1, 2, 3, 6, 7, and 9 of patent No. 1,020,656. Both patents were applied for by Frank G. Perkins, and issued to the complainant.

The patents relate to the process of making starch glue, also to the glue itself; cassava starch being preferably employed. The first or reissue patent covers in its first step the use of acid and heat, but

the second employs an alkali without heat. Hence the first is called the acid, and the second the alkali, patent. The process is described in the second patent thus:

"As an illustration of my process, I preferably take the cassava carbohydrate in dry form and mix with it a small amount of water and provide agitation. To this batch I then add preferably from ¼ per cent. to 1 per cent. by weight of sodium peroxid in the form of a solution of substantially 20 parts of water to 1 part of peroxid by weight. Shortly before or after this treatment I also add ¼ per cent. to ½ per cent. by weight of caustic soda in the form of a solution of about 10 parts of water to 1 part of caustic by weight. These proportions of reagents are based upon the weight of dry materials. This mixture is more or less continuously agitated for about 12 hours, but without the application of heat. The batch is then removed and dried, and is made ready for shipment to the consumer in dry form, if it is not to be used at the place where made. The glue base is preferably left in this condition until just before it is desired to use it, when it is treated in accordance with the second part of my process. The dry material obtained from the first part of my process is mixed with preferably from 2 to 3 parts by weight of water, according to the economy and strength of glue joint desired. A liquid suspension is thus formed, which is agitated and treated with a reagent which will act to dissolve the material. I believe the result is a colloidal solution. For this purpose I preferably use an aqueous solution of caustic soda or potash, using from 6 to 10 per cent. of the weight of the dry powder, of dry caustic soda, or equivalent of caustic potash. The alkali is best added in the form of a solution of from 33 per cent. to 50 per cent. strength."

Claims 7 and 9 are given as most nearly expressing the two steps referred to:

"7. The process of making a wood glue, which consists in agitating a starchy carbohydrate or its equivalent with a solution of sodium peroxid and caustic soda to decrease the water absorptive properties of the carbohydrate without rendering the carbohydrate materially soluble in water, to properly proportion the viscosity, adhesiveness, and cohesiveness resulting when the carbohydrate is dissolved to form glue, and dissolving the product thus produced with caustic soda, or its equivalent, and about 3 parts of water or less, to produce a glue for application."

"9. The process of making glue, which consists in treating a suitable amylaceous material in two stages, in the first stage treating it with sodium peroxid, or its equivalent, and caustic soda, or its alkali equivalent, and in the second stage treating with caustic soda, or its equivalent, to form an alkaline wood glue."

It is claimed for Perkins that he was the first to produce wood glue from starch which could be used in the wood veneer art with results equal to animal glue, and that he was able to get this result only after the most extended and patient experiment for a number of years. It is conceded that starch sizes and pastes had been produced by others, but it is said he was the first to discover the suitable proportion and co-ordination of the variable factors of the two successive steps; the first a slow and partial starch-degenerating step, and the second an alkaline dissolving step, so regulated as to make the product like good animal glue of the proper viscosity to be spread by machinery over a large surface, and of suitable cohesiveness in itself and adhesiveness to the wood, and possessing penetration and holding power, as well as being moisture proof and not affected by heat or drought. It is also claimed that substantially all the prior art was considered by the Patent Office on Perkins' applications, and that he was granted

a German patent after strenuous opposition, and upon a full hearing, accompanied by actual experiments and tests.

There are many prior patents covering vegetable paste, size, and mucilage. Of these are the French patent to Ferdinand Virneisel, No. 337,001, issued November 16, 1903; the German patent to Gerson & Sachse, No. 167,275, of January 31, 1906 (which is the German edition of Virneisel); the German patent to Kantorowicz, No. 88,468, of August 7, 1896; and the American patent to Higgins, No. 579,872, of 1897. Of these the best examples are Virneisel and Gerson & Sachse. If the patents in suit were only for sizes, pastes, or mucilages, they could only be sustained as covering specific processes. But it is claimed that Perkins was the first to teach the practical art of making vegetable glue equal to animal glue, and that, even if his glue base is substantially the same as that of Virneisel (which is not admitted), he applied it to a new use of great utility by producing a cheaper adhesive, as good as animal or hide glue, less objectionable as to odor and in other respects. It is further claimed that defendants deliberately appropriated the Perkins base after it had become successful, by sending an agent to the Perkins manufactory under a false name, hiring a Perkins foreman, advertising that they could produce the Perkins base, and using the identical process for awhile, and then changing it only in an unimportant particular.

Defendants do not make, use, or sell the Perkins glue as it is after the second step, ready to apply to the wood veneers. They only make the Perkins glue base, and sell it to wood veneer manufacturers, who are equipped with the tanks, pipes, rolls, and other machinery used for spreading the product. If they do not infringe, therefore, by producing the base, they can be held as infringers only if the facts justify a finding of contributory infringement.

The veneer gluing industry is now very extensive. Veneers are made with from two to five layers, often with the grain at right angles in the adjacent sheets, and are very strong, durable, and ornamental. Before the Perkins invention the more expensive animal glue was used exclusively for this purpose, but the former may now be used as a substitute. It must, however, have a large footage in order to compete. One pound should cover an average of 50 square feet. It must be spread by machinery, have the proper consistency to flow through feed pipes to the spreading rolls, properly penetrate the wood as well as cover its surface, and must not penetrate too far so as to leave an empty joint. It must be homogeneous and nongelatinous, and above all possess great cohesive strength and great adhesion to the wood. It should dry rapidly, and never contract materially, so as to destroy cohesion. The necessity or desirability of these qualities, and others which might be mentioned, shows the exacting character of the glue veneer art, so it is not strange that it should require such long and patient experiment as the testimony shows.

The Perkins invention has been very successful. Millions of pounds of what is called the glue base (being the product of the first step of the alkali patent) are sold each year. Apart from certain equities

and presumptions favorable to the complainant, the following account of the prior art and defendants' practice, written by defendants' counsel, is a clear and generally fair statement:

"At the time Perkins entered this field it had long been old to form adhesives by dissolving starch in a suitable aqueous solution in different proportions of starch to solution, according to the use to which the adhesive was to be put. The starch solutions so formed were used in various relations as substitutes for animal glue, as in sizings and coatings of various kinds, as well as in the gluing together of bodies of wood and the like. The solvents more commonly employed were hot water and cold dilute aqueous solutions of caustic soda: the former being used where it was desirable to avoid staining or other injury by the caustic, and the latter to dispense with heat. The caustic solvents were also sometimes heated.

"Starches as found upon the market, then, as now, had different degrees of solubility, depending on the sources from which they were derived, the processes by which they had been separated from the plant, and their subsequent treatment. Consequently, when dissolved under the same conditions they would yield adhesives of different degrees of fluidity, dependent upon the solubility of the starch. It was established commercial practice to treat the less soluble raw starches, which would not, without excessive water, yield sufficiently fluid solutions for the various purposes for which they were designed, with reagents to increase their solubility, after which they were dried and placed upon the market. The degree of solubility of the starch depended on its original condition and the extent to which the treatment was carried, and varied from the substantial insolubility of raw starch to the ready solubility of soluble dextrin or glucose. For some uses of such adhesives one degree of solubility was desirable, and for other uses another. Thus, where a very thin, penetrating, easily absorbed coating, readily soluble in cold water, was desired, as, for example, for envelopes, postage stamps, and the like, glucose or soluble dextrin was best. For starches for certain laundry purposes and sizings, a material less soluble in cold water was advantageous. Different sizings demanded different degrees of solubility. By stopping the process of degeneration or modification of the starch at the proper point, any required degree of fluidity within wide limits could be attained.

"The process is a progressive one, as before pointed out, and since some of the starch grains are more readily affected by the reagent than others, at any particular stage of the treatment a batch contains grains in different stages of degeneration or solubility. Thus, at one point of the treatment the batch will contain dextrin along with other less modified starch granules. It had long been known at the time Perkins entered the field that dextrin was a weaker adhesive than less fully treated starch, and that therefore, to get a maximum strength of product the treatment should not be carried to the point where dextrin, which is soluble at ordinary temperatures, is formed. Therefore, when an adhesive with great strength was desired, care was taken to stop the treatment at a point where little or no dextrin had been formed in the batch. Now, as before stated, it is desirable in all adhesives to obtain the necessary degree of fluidity with as little water as possible, since the latter must be eliminated by drying in setting the material. For this reason it was recognized as desirable to carry the process as far as possible without the formation of the objectionable dextrin, and thus secure a maximum fluidity without detriment to the strength and adhesive qualities of the material.

"Many different reagents can be and have been employed to effect this degeneration, and among them the very reagents employed by defendants. We find in a single prior art patent the preparation of the identical glue base or material by degenerating starch to the same point to which defendants' material is modified, by the same reagents, and by the same method. This material, as stated by the patent, was put upon the market in the same form that defendants' material is put upon the market, and was sold, to be dissolved by the user in a solvent containing the same aqueous solution, of the same reagent, of the same concentration as defendants' customers employ. The only difference between the process of this particular patent and the

practice of defendants is in the use to which the glue material is put and the consequent difference of dilution of the solution thereof. The patentee refers to the use of his adhesive for dressing or finishing, i. e., sizing or stiffening fabrics, while defendants and their customers employ the material for sticking veneer layers together. Therefore the prior art patentee uses and describes a relatively dilute solution, while the defendants employ a relatively heavy solution. No other difference exists. It is the defendants' view that this difference is an immaterial one, especially in view of the fact that similarly modified starch had been dissolved in aqueous solution in substantially the same proportion of starch to water employed by defendants, to make a glue for the same purpose as that for which defendants' glue is employed, to wit, to glue wood together, and otherwise as a substitute for animal glue."

In addition to the defense outlined in the quoted statement, defendants urge that complainant has raised a false issue by comparing its present product and process with the prior art, instead of so comparing the products and processes disclosed in the two original Perkins applications. They urge that it is a false issue to take all the discoveries as to proportions, manipulation, and apparatus up to the present time, and the present product itself, and set them off against Virneisel; the true question being: What did Perkins show when he went into the Patent Office? and what did Virneisel, Kantorowicz, Higgins, and other prior inventors disclose by their prior patents? This claim of defendants treats all the material amendments made during the Patent Office proceedings as new matter, not authorized by law, and hence to be rejected.

In order further to get the full force of defendants' position (so far as may be without giving the full argument), it should be said Perkins merely occupied a particular part of a prediscovered field. The important question was how far the starch should be degenerated in the first step of the process. Defendants' counsel say:

"The two extremes were the untreated starch insoluble in water at one end of the line, and at the other end the dextrinized product soluble in cold water. Between these two extremes lay a range or a field of varying degrees of degeneration. But this intermediate field had already been discovered, entered, and described by many inventors, including Virneisel, Kantorowicz, Brueder, etc. All of these inventors had expressly described as preferred that degree of degeneration just short of solubility in cold water, as we will later on more particularly show. Therefore, when Perkins appeared upon the scene, nothing remained that he could possibly do excepting to select some other specific degree within this field or range. Inevitably his invention, if any, must be one of simply narrowing or limitation, and it is from this standpoint that all the questions in the case must be viewed, including questions as to new matter introduced after the original applications were filed, and particularly after the death of Mr. Perkins."

[2] It seems obvious that this contention would be perfectly sound if the Perkins patents related to a new form or process of an old product. But how is it to be regarded when applied to a new product? If an inventor finds a chemical substance devoted to a particular use, conceives the idea of applying it to a new purpose, and on experiment discovers that the substance must be treated in a particular way to suit his purpose, which method of treatment is essential to his end, but of less importance in obtaining the prior art results, it is apparent that he may be regarded as a real inventor, even though he selects

a specific treatment in an occupied field. If he were making only a paste, as others had done, it might not be invention to select part of the old field of experiment, although he might thus produce an improved paste. But he discovers a novel and valuable use for the old product, which he modifies to suit the new purpose. In connection with his new and useful result, and as against a person who produces the old product as modified, and who sells it for the new purpose, he is an inventor, entitled, not only to restrain such sale, but also the manufacture or use of the product.

Two cases in this circuit may be referred to as supporting and illustrating this position: Kuehmsted v. Farbenfabriken, 179 Fed. 701, 103 C. C. A. 243, affirming (C. C.) 171 Fed. 887 (the Aspirin Case); and Hoskins Mfg. Co. v. General Electric Co. (D. C.) 212 Fed. 422, affirmed 224 Fed. ——, —— C. C. A. —— (the Calorite Case). In the Aspirin Case, Hoffman took the exact formula of an old chemical powder formed from acetic acid and salicylic acid, and discovered a method of purifying it so as to enormously increase its medicinal properties. There was another way to purify it, and the evidence did not show just how defendant did this; yet he was held as an infringer. Here were the two steps analogous to the glue process. One was old; the other new, and with an improved result. The Calorite Case relates to the nickel-chromium wire used in electric flatirons, toasters, etc. The inventor claimed only a new use for an old alloy, and his invention was sustained. Judge Kohlsaat cites many cases of the new use of old materials in which the patents were held good.

The patents are meritorious and valuable inventions, and have been successful. They should not be narrowly construed, but treated as a distinct advance in the art, achieved only by long and exhausting trials. I think they should be sustained.

In regard to infringement the evidence shows that the defendants, or some one acting for them, sent agents to the Perkins plant in Florida about the time the patents were applied for, to find out what was going on there. Shortly after this one of the defendants went there under an assumed name. Mr. Warren, foreman of defendant company, formerly worked for the Perkins Company, and applied for a position with defendants, telling them that he knew how to make Perkins glue, and later he was hired for the purpose of making glue from cassava starch, which he had been doing in the Perkins plant.

Defendants make their glue in substantially the same way as the Perkins Company, except that in the first step of the process defendants use sal ammoniac in addition to caustic soda. Defendants' position is that the Perkins patents are so limited that this change of the first step avoids infringement. Their counsel state the matter thus:

"Long prior to the issue of the patents in suit defendants were engaged in the treatment and sale of starch for this purpose, and at the time the patents issued the defendants' process involved the use of peroxid of soda and caustic soda as the reagents for degenerating or modifying starch. After plaintiff's patents issued and had come to the attention of defendants, the process was changed from the use of caustic soda and peroxid, which was claimed in one of them to the use of the present solution of peroxid of soda and sal ammoniac, which, as will later appear, are reagents long employed for the purpose in the prior art."

Defendants used the Perkins process until August, 1912, and then changed the first step as follows: Instead of using ¼ per cent. peroxid and ½ per cent. caustic, they used ¾ per cent. peroxid, omitted the caustic, and added ¼ per cent. sal ammoniac several hours later. The Perkins tests were used to determine when the starch had been properly processed. The witness Hase testified that he demonstrated the Solva glue in 1913 and 1914 in practically the same way the Perkins glue was used in the plant of the St. Louis Basket & Box Company, where he had been foreman. This is the second step of the process. On January 5, 1912, the Solva Company wrote to Gorham Bros. thus:

"For some time we have been trying to interest you in our Solva glue, and due to the fact that we are to-day making glue identically as that which you are getting from the Perkins Glue Company—in other words, we have in our employ the glue maker and chemist who were with the Perkins Company for 11 years past—we can furnish the same glue as what you are using."

As to the use of the Perkins second step, the Solva Company wrote Gorham Bros. April 12, 1912, as follows:

"This glue you can use at the rate of 2½ or 2¾ pounds of water to one pound of glue, caustic to be used 7 per cent. to the cold mixture and 3 per cent. with heat. Some of the trade are using the 3 per cent. mixture, which avoids the staining of wood."

It often happens that cassava glue base can be used without any processing by the first step, in which case it is tested and sent to customers in its original state. Infringement clearly appears.

I have carefully considered the defense of prior use, and am fully satisfied from the evidence that Perkins never perfected his invention until the spring of 1907; his applications having been filed November 2, 1908. All his practice up to about the earlier date was experimental.

As to the amendments to the specifications in the Patent Office, I think they were not new matter, but only in the line of making the real invention clearer.

There should be a decree adjudging infringement of claims 13, 16, 19, 24, 28, and 38 of the acid patent, and 2, 6, 7, and 9 of the alkali patent, and for an accounting, as prayed, and injunction, with costs.