**PERKINS GLUE CO. v. HOLLAND FURNITURE CO. et al.**

(Circuit Court of Appeals, Sixth Circuit. April 2, 1927.)

No. 4259.

**1. Patents ⬅⟊328—Reissue, 13,436, for wood glue, held valid and infringed.**

Perkins reissue patent, No. 13,436, claims 28, 30, and 31, for wood glue, *held* valid, as not being anticipated, and infringed, though defendant used starch base, procurable on market, instead of using first step of Perkins' process to procure such base.

**2. Patents ⬅⟊8—New process and product are separate inventions.**

New process and its product are separate inventions.

**3. Patents ⬅⟊155—Disclaimer as to process claims of wood glue patent held not to affect product claims.**

Disclaimer as to process claims on reissue patent, No. 13,436, for wood glue and process of making it, *held* not to affect product claims.

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit by the Perkins Glue Company against the Holland Furniture Company and others. From a decree dismissing the bill, plaintiff appeals. Reversed and remanded.

Gorham Crosby, of New York City (Kn:ppen, Uhl & Bryant, of Grand Rapids, Mich., on the brief), for appellant.

William H. Davis, of New York City (James A. Watson, of Washington, D. C., on the brief), for appellees.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. This case relates to glue. Until recently the word implied an animal substance base. The Century Dictionary so defines it, and does not include any vegetable composition, save by a reference to gum arabic, although the patent art shows an occasional use of the term "vegetable glue." Various adhesives had been made with a starch base, running from a sticky mass, through stages of dilution, to a highly fluid, slightly adhesive, sizing. In common understanding, glue, paste, and mucilage were fairly distinct families. Glue was largely used in furniture and similar arts, and especially in veneering, in which relatively large sheets of wood were to be fastened together, commonly in several very thin layers. It was necessary that the bonding material should be spread, by hand, brush, or machine roller, over large surfaces very quickly, thinly, and evenly, and that, when set, the bond should be exceedingly strong. Hence its essential qualities must be a high degree of fluidity for application, and extreme tenacity when set. Glue—animal glue—had these qualities, and to speak of animal glue, or to say "as good as animal glue," was to imply them.

Perkins was, beyond dispute, the first (disregarding now the purely paper references) to make a successful starch glue, suitable for veneering and similar uses. He described it as being "as good as animal glue," and it proved to be. It was rapidly and generally adopted by the furniture and veneering industry, was cheaper and more easily used than animal glue, and even more effective in the firm bonding of wood or fiber surfaces. In a practical and commercial way, Perkins was a pioneer, and his discovery was one of importance. As to the claim of invention, he is entitled to whatever credit and presumption the law infers from striking, and in a sense revolutionary, commercial success.

His basic material was starch, and it seems to be accepted all around that cassava starch has qualities which make it the best for this purpose. This is made from the cassava root, which manufacturers, in the tropical countries where it grows, grind, dry, wash, bleach, and otherwise treat to put it in the condition in which it comes upon the market here, and is commonly called by the rather vague name "raw cassava starch." In this form it may have varying degrees of viscosity—a term expressing the inherent intermolecular friction of the material, dependent upon its water-absorbing capacity, and usually measured according to testing apparatus used after the mixing with water. It was known (though very likely not to Perkins) that this inherent degree could be lessened by artificial treatment, called degeneration.

By the use of acid and heat, in very limited amounts, Perkins lessened the capacity of the starch molecules for water absorption, but was careful not to carry the treatment far enough to change the starch into dextrine or to dissolve it, which, with the subsequent treatment, would have produced paste, mucilage, or sizing. The subsequent treatment, also broadly well known, consisted in dissolving in water, with caustic soda or similar digestant, the cellulose of the starch molecules. Thus the primary starch and water mixture was converted into a new compound, which had customarily been one of those weaker adhesives, and which by Perkins' treatment became glue. Because the starch water-absorbing capacity had become relatively small, a small amount of water would make a fluid mixture, so that it could be properly applied, and yet the necessary tenacity would remain. Water enough otherwise necessary to give fluidity would have produced a dilution with relatively poor tenacity, like the old pastes, and, when applied to wood, requiring a long drying, and leaving little bonding material permanently in the joint. Perkins' glue was quickly dried, and was so adhesive that, on pulling apart, the wood itself frequently gave way, while the glue held.

[1] To get the monopoly contemplated by the patent law, Perkins obtained a patent dated March 19, 1912, which was almost immediately reissued as reissue No. 13,436, dated July 2, 1912, upon "glue and method of making the same." It has 38 claims, divisible into groups—one group covering the so-called glue base, the product of the first-described, or degenerating, step; one group relating to the process of making this base, the first step process; one group covering

the process of dissolving the base, the second step; another drawn upon the double, or two step, process; and still another group based upon the ultimate product, the glue itself. Three claims, selected out of this ultimate product group, are the only ones now in suit—28, 30, and 31. They are as follows:

"28. A glue comprising cassava carbohydrate rendered semifluid by digestion and having substantially the properties of animal glue."

"30. A wood and fiber glue, formed of a starchy carbohydrate or its equivalent by union therewith of about three parts or less by weight of water and alkali metal hydroxide.

"31. A wood and fiber glue containing amylaceous material as a base dissolved without acid in about three parts of water or less, and being viscous, semifluid, and unjellified."

Of these the broadest is perhaps 28; but it appears that a glue, thus composed, will not have "substantially the properties of animal glue," unless containing only the critically small amount of water specified in claim 30. It also appears that an article which is a wood and fiber glue, as distinguished by the specification from other things, will be "viscous, semifluid, and unjellified," as specified in claim 31. However, for the purposes of this case, claim 30 may be taken as the claim in suit, and the other two will stand or fall with it. Neither as to validity nor infringement is there vital difference.

[2] If this claim is to be interpreted at its face value, infringement cannot be—indeed, is not—questioned. The defense primarily urged is that the specified process, or processes, must be so far implied in the claim that defendant does not infringe. This is not the ordinary rule. From the Goodyear Case, 9 Wall. 788, 796, 19 L. Ed. 566, to the Leeds & Catlin Case, 213 U. S. 301, 318, 29 S. Ct. 495, 53 L. Ed. 805, it has been laid down that a new process and its product are separate inventions (and see our review in Dunn v. Toronto [C. C. A.] 259 F. 258); and protection was given by separate patents or by differing claims in one patent, as the Patent Office rules of practice have from time to time provided. Normally, a new process may result in several products, in addition to that one which is new and which is patented. Normally, a new product may be made as well by some old process, or by some new method, other than the one patented. Those cases are exceptional where process and product are necessarily mutually inherent, and are inseparable, "like the two sides of a sheet of paper." Among applications of the

general rule are General Co. v. Laco-Philips Co. (C. C. A. 2) 233 F. 96; Procter v. Berlin (C. C. A. 2) 256 F. 23; Maurer v. Dickenson (C C. A. 3) 113 F. 870; Baker v. Refractories Co. (C. C. A. 3) 253 F. 741.

Where a new process brings a new product, that is, one never made before by any process, there may be difficulty in separating the mental conceptions of the two, or in describing either, except in the terms of the other. If that difficulty is insuperable, it perhaps demonstrates that there is only one invention; but theory and practice alike require that if there are two patents, or separate claims, for the two inventions, there should be claim identification by which each claim is expressed with substantial independence of the other. Claim 30 fairly meets the test. In the two phrases "formed of" and "by union" there is a suggestion of reference to method, but only a suggestion; the substantial reference is to the constituents which make up the finished product, and is without dependence on the method by which they are combined. The process might, and by the specification does, more or less involve temperature of the water, degree of slowness in adding the starch base, strength and quantity of the alkali, violence and time of agitation, etc. Some of the process claims do incorporate such methods; some do not. For example, claim 10 (not in suit) says: "The process of making glue which consists in dissolving cassava carbohydrate in caustic alkali until a glue is formed, as distinguished from mucilages, sizes, and paste." This specifies no possibly new process except by reference to the resulting product, and hence it cannot be distinguished from a product claim; but the result is, not to impeach the corresponding and properly formulated claim for the article produced, but to invalidate the process claim, which reached for something it could not lawfully grasp.

Upon the whole, and upon the face of the patent, we see no reason to doubt that claim 30 is a valid product claim, properly expressed, covering what it identifies, and not limited by any forced importation of process. If so, it is immaterial that defendant may not use the process steps, or either of them; and infringement is not to be doubted.

We understand defendant to contend at this point that, although claim 30 is not on its face limited to any specific starch base, we must, to save the claim, imply a limitation by starting with the product of the first step. We do not agree. We are analyzing a result into its elements. Not to save from anticipation, but to make operative and intelligible,

there is an implied limitation to that base which, when combined as stated, will give the result stated. In other words, out of the variety of starchy carbohydrates we must select one suitable for this combination. In this there is no forbidden vagueness, for the specification teaches that starch is suitable when its water-absorbing capacity is not too high nor too low, but is in what we may call for convenience the medium range. It cannot be said that Perkins put any absolute limits on this range. He was not obliged to do so, and he carefully refrained. He warned that the degeneration must not be carried to the point of disintegration, or of starch solution (line 45, p. 2); but he states no maximum or minimum limit, purposing rather that this water-absorbing power can be "regulated" (line 68, p. 3).

So far from supposing that he must use his first step and carry it to a definite point was he that he said he could start the second step, though not as well, with "certain grades of untreated cassava" (line 81, p. 3).[1] He then gives a method of testing his proposed base to find whether it is sufficiently degenerated to suit him, the 9 to 1 boiling test (line 125, p. 3); but he introduces this by saying (line 121) *"one way"* which has been found satisfactory for determining, etc., is." As to the other test which he suggests, the 170 degree test, he says (line 74, p. 4): "Also in actual practice I have found that a good glue is produced by treating the base with the chemicals to reduce the water-absorbing power to a point where," etc. It seems to be true that the "raw starch" which defendant uses as the base of the process by which it makes its glue is not within the limits of inherent viscosity indicated by either of these operations, although it clearly is within that medium range which is essential to the result. We think this not important in considering the construction of the patent on its face. To confine the base to these two suggested examples (they are examples, not tests) would be to rewrite the specification.

Coming to the next point in the discussion, defendant says that it is buying an ordinary raw starch on the market, as it rightly may, and dissolving it into glue by an old process, as it rightly may, and thereby gets the product it is using in its veneering work.

This is to say that claim 30 (construing it as we do) is invalid for lack of invention. No one knows just why it is that no brand of cassava starch which Perkins could buy about 1908 could be used until after artificial degeneration, while defendant finds that some present regularly marketed raw starch makes a satisfactory base for the second step. It may be that changed methods of cultivation or manufacture have brought the viscosity down to the medium range; it may be that peculiarities of defendant's dissolving operation take the place of Perkins' preliminary treatment. In former litigation on this patent, it has been thought a controlling thing that nature, since Perkins' invention, had evolved a substitute for his artificially degenerated base; but we see no importance in the subject. The utmost effect of defendant's claim would be to make the situation the same as if the present base used by defendant, the Kane base, had been as freely for sale in 1910 as it is today; and this is practically the same situation already created by the now conceded fact that Perkins' base, product of his first step, was old at the time of Perkins' work.

In former litigation it has been held that Gerson and Sachse, by their German patent, had disclosed substantially Perkins' first (degenerative) step and his resulting glue base. Perkins acquiesced in this result, and disclaimed wholly those claims which covered the first step process or the glue base product. Hence the question must be: "Was there invention in taking this known starch base, which had the essential degree of viscosity, and making a real glue out of it, as Perkins for the first time did?" We see no sufficient reason for a negative answer. The art is full of instances where a starch base had been dissolved with an acid or alkali in a water mixture, but no one had ever made thereby a successful or useful wood or fiber glue; nor has any one since been able to make such a glue, using only the instructions found in the prior art. The results had been (with a little water) a pasty jelly, unworkable and useless as a glue, or (with much more water) a thin paste, mucilage, or sizing, also useless as glue.

Whether Perkins reasoned it out or stumbled on it, he was the first to discover that, by taking a starch of then peculiar qualities, he could dissolve it in less than three parts of water, and get a product both fluid enough and strong enough to be a practical and useful glue for all purposes requiring glue, not paste. This same Gerson and Sachse patent is the nearest thing along this line. They did not much detail how to

---

[1] This was perhaps merely prophetic, because the record indicates that he had not found any raw starch which would perform properly for his second step; but he was at least guarding as well as he could against the possibility that there might then be, or might later come into the market, some usable raw starch.

use their glue base after, it was made, but they said it might be dissolved in water, 5 to 100, with 2 per cent. of caustic. All agree that this would give a sizing suitable for filling a fabric, but worthless for joining wood. It gives, at the best, a strength of 300 to 400 pounds to the inch, while an effective wood glue requires 1,000; and both Perkins and defendant get 1,500 to 2,000. In no accurate sense can this sizing be called the glue product of the Perkins patent. It is distinguished by the critically different quantity of water in the composition, and by the lack of the characteristics of a wood and fiber glue, as respectively defined in the specifications.

It is said that those who had used a high viscosity starch base with a small amount of water *had the right* to use any known quality of starch, and that those (like Gerson and Sachse) who had used starch of a medium range in viscosity, with large quantities of water, *had the right* to use any amount of water, more or less. Of course they had. *Non sequitur* that there was necessarily no invention in selecting and uniting the peculiar base of one and the peculiar water quantity of the other. Patents are commonly granted, and sustained, for just that type of selecting and uniting mechanical elements, when they bring a long-sought and strikingly useful result, which gets wide acceptance and use. Much more should it be so with chemical reactions, often not fully foreseen.

If the *right* of a prior inventor to vary proportions, sizes, and relations in his article as much as he pleases barred a patent to a subsequent worker who *did* make the variation, which the first man *had not* done, many familiar decisions are wrong. In the Minerals Separation Case, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286, and 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019, the earlier inventors had used oil in varying quantities, and had the right to use less than 1 per cent. The patentees first observed that with less than 1 per cent. they got a much better result. Eibel's predecessors (261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523) had flowed the fluid paper pulp down a screened incline with an elevation of 3 inches. He raised the upper end 9 inches, making the incline 12, instead of 3, and thereby made as good paper at a faster rate. He did not merely observe that the steeper the hill the faster water would run down it; he saw that an existing trouble would be cured by a faster flow. So with Perkins. He did not merely observe that, if he used less water than Gerson and

Sachse, he would get a thicker paste; he saw and developed the reason why he could use a very little water, and get something never before obtained—a starch base wood and fiber glue. His conception and development of the interactions of his selected starch base and the alkaline solvent with the water minimum, and his creation thereby of a new product, following years of commercial need for and unsuccessful effort to devise such a product, followed by the general adoption by the industry, seem to us to meet and satisfy the universally accepted tests of invention.

We have so far proceeded on the assumption that Perkins was the first to make from starch a product properly called a wood and fiber glue, as distinguished from pastes, jellies, and mucilages. Is this assumption justified by the record? The alleged public use by Perkins for more than two years was carefully considered in the Solva Case (C. C. A.) 251 F. 64, infra, and was held ineffective because it was composed of a series of efforts which did not pass out of the experimental stage into the fully developed invention until less than two years before November, 1908. We see no occasion to reach any other result on that subject.

The Gerson & Sachse patent (German) has been mentioned. It produced only "a very thick mucilaginous liquid." It contemplated 20 parts of water to one of starch base. It was "very suitable for purposes of dressing"; i. e., fabric sizing. Its use as a wood glue was not contemplated, nor was it possible except by departing from the suggestions of the patent. "Apparetine" (Gerard, British and Belgian patent) used a raw potato or other starch. Gerard did not disclose that it must be of the medium range, but it may have been. He used more than five parts of water to one of starch. He made "a new composition for sizing fabrics." Though he said that his article was "of considerable adhesive power only to be compared to that of [animal] glue," it would be worthless for general wood joining use. It very possibly did have among the threads of the fabric an adhesiveness comparable to that of some low grade or thin animal glue, which alone could have been used for sizing purposes. More probably, his laudatory statement was as unintelligent as it was vague. His specification shows he was aiming directly away from Perkins' target. His product, known 25 years before Perkins', was never used as a wood glue. Defendant's expert, in (supposedly) reproducing the patent for the purposes of this case, used only

2½ parts of water (Perkins' claim of "less than 3") instead of 5, and frankly says that "the veneering industry would not tolerate as much water" as Gerard used.

Higgins (United States patent of 1897) made a "starch paste" (the familiar "library paste") "a soft or firm paste." He degenerated his starch and dissolved the cellulose (as far as he went) in one continuous process. A hasty reading of his patent indicates that he came much nearer to Perkins than any of the others did; yet the most that can be said is that he *almost* anticipates, not quite. His preferred formula carries the degeneration nearly to the dextrinizing point, and produces a good paste for uniting papers. He thought—and said—that by varying his formula he could make an adhesive of any strength up to that of animal glue; but he was mistaken. The record indicates that, if Higgins used the Perkins proportion of starch and water (as he said he might), he should, in order to get a successful wood glue, have used much less heat than he specified or should otherwise have arrested degeneration (the action of the acid) at an earlier point, and this he did not know. True, he speaks of arresting the digestion (by which he means the action of the acid) at the "glutinous stage," when the adhesiveness is greatest; but he spoke vaguely, and when he thus "arrested the digestion" he did not conceive a further dissolution and "coming across." He ran it at once into jars for storage.

Perkins degenerated his starch with acid (or, by assumption, selected a starch of the same viscosity quality), and dissolved it, and particularly the cellulose, with alkali. Higgins used only acid for his degeneration and for his further mixing step, both of which he includes in the name "digestion"; he used his alkali only to neutralize the acid and stop the "digestion"; it would seem likely enough that his cellulose would be imperfectly dissolved and his product not be a successful glue.[2] Whatever the scientific reason, the fact is clear that the Higgins patent never was accepted as teaching the art how to make a wood glue; somewhere and

somehow it fell short. Defendant's expert conducted a series of experiments making veneer glue joints with glues which he made after various old patents (with variations which he thought permissible); he did not even try to use anything made according to Higgins. Plaintiff's expert tried every variation suggested by Higgins, and could get nothing better, in adhesiveness, than 500 or 600 pounds to the square inch—quite insufficient for the furniture and veneering art— as we have recited re Gerson and Sachse. In short, Higgins does not respond to even the broad identification of claim 30, because his product is not, according to the lexicon of the specification, a "wood and fiber glue."

As to all the other alleged anticipations, it may be said that either from lack of efficient base, or from too much water, or too much degeneration, or lack of complete cellulose dissolution, or some similar reason, each one was practically useless as a wood and fiber glue, failed of doing any good to the wood-joining art, and, to be effective, needs modification along Perkins' lines. We have in the end a rather typical instance of the difference between success and failure. The situation, as we see it, is well stated in a quotation found in plaintiff's brief. "This new product is susceptible of identification irrespective of any reference to the process. If it has all the characteristics and capacities of the animal glue of the prior art, without containing any animal substance, and is novel, useful, and a result of the inventive faculties, it is patentable."[3]

[3] There remains the subject of the effect of the former litigation and of the disclaimer resulting therefrom. This litigation presents to our mind the most serious obstacle to plaintiff's case. It appears that one Kane, knowing of the success of the Perkins glue, became interested in its commercial aspect, and, associated with former employees of Perkins, familiar with the situation, he put upon the market, as a glue base to be used by manufacturers for making the glue in their factories, a starch which has been called the "Solva base." He and others organized the Solva Company for this purpose. Perkins brought an infringement suit in the Northern district of Illinois, claiming infringement, either direct or contributory, of claims out of each of the five groups. It appeared that— to accept the defendant's argument there— "the major portion" of defendants' output was raw cassava starch, just as is now the case (the present Kane base is used by the

---

[2] Dr. Grosvenor says the partly dissolved portions of starch grains under the microscope look like broken stone or cement, "and the resulting adhesive cannot be strong enough for a wood joint." * * * "The theoretical considerations" by which Higgins "pointed the way are perhaps correct theory, but the * * * practical possibilities were not conceived, and are far from the facts actually realized by carrying out Higgins' process. * * * Higgins says a number of enthusiastic things, but the facts are it [his paste] is an entirely different product, not useful for woodwork."

[3] This statement was made by Judge Lacombe, after his resignation, and while employed as counsel in this matter.

present defendant), but that some portions of their output had been degenerated, either by a mixture with low grades of raw starch on the market or by a preliminary treatment like Perkins' first step.

The case came on for final hearing before Judge A. L. Sanborn (D. C.) 223 F. 792. He sustained the patent and found infringement of one claim out of each of the five groups. He based his conclusion upon his adoption of the same general view of the facts and the law to which we have in the foregoing pages given our approval, as far as they relate to that part of the subject-matter which has continued to be and is here in controversy. His opinion indicated that the glue made from that Solva base which was only the raw starch, was within the valid claims of the patent. In the decree, no distinction was made as to the different kinds of Solva base involved in the case. Upon appeal by the defendant, the Seventh Circuit Court of Appeals rendered an elaborate opinion. 251 F. 64. It is not too much to say, as Judge Sanborn did after the remand, that it was in some respects obscure; indeed, the uncertainties which have developed in trying to apply it in other cases have led to much difference of opinion. We cannot attempt an elaborate analysis. It held that the claims to the first step of the process and to the product resultant therefrom—the glue base—were anticipated by Gerson & Sachse, and hence that the glue base, as a product and as the foundation of the second step in Perkins' process, was an old and unpatentable product. It found that Perkins' glue had the novelty and merit claimed for it. It sustained the claims to the compound two-step process, and, to some extent, at least, the claims to the ultimate product, and did not sustain the claims to the second-step process. No attention was paid to any distinctions in the different kinds of Solva base that were involved. Its treatment of the process claims to the second-step process is open to the interpretation—and we think it the right one—that the court considered those claims broad enough to cover the specified treatment as applied to any starch base, however high in viscosity, and employing water to any extent, and even though the product would not approximate Perkins' glue, and hence thought them invalid. If that view was correct, they *were* too broad. At the conclusion of its opinion the court said that the decree below "sustaining the claims for the glue base and product; and for the so-called second-step as such, is reversed, and that part of it which upholds the claims of the patent for the final process and the resultant product is affirmed."

The only claim which had been sustained below to the "resultant product" was the claim to the final glue, without reference to the processes involved, and it seems to us fairly clear that the court used this phrase to refer to the resultant product of the second step, meaning thereby the ultimate product claims, as distinguished from the intermediate product which was the "resultant product" of the first step, and was found to be old. We do not find in the detailed discussion in the opinion any considerations which would compel, nor do we know of principles which would permit, a holding that the final product claims, as they read, extend only to glue which had been made by the employment of both steps of the compound process, and we think we should not attribute to the court any intention to declare that limitation.

Upon rehearing application in that case the court was by defendant urged to clarify its opinion, so as to show that there would be no infringement unless both steps of the process were used. The petition for rehearing was denied without comment. The opinion came up for interpretation when Judge Sanborn settled the final decree upon the mandate. He decided that the claims for the ultimate product were infringed, again making no distinction between the different varieties of the Solva base. He held that the claims for the second process step were not valid, but, as they read, were the claims "for a second step as such," to which the Circuit Court of Appeals had referred as invalid. From this decree neither side appealed again, although Judge Sanborn suggested that a second appeal was rather necessary for interpretation.

Several references have been made to the fact that plaintiff did not appeal from the decision holding invalid the second-step process claims as they read, and for lack of such appeal inferences are drawn against the plaintiff as to the validity or scope of the final product claims. This is again a *non sequitur;* and we see no basis for such inferences. The plaintiff had an infringement decree upon the product claims. Its injunction could have been no broader, nor its recovery of damages greater, if the process claims were also sustained. The decree sufficiently bound the defendant, and it would not bind strangers anyhow, no matter what form it took. Whether plaintiff should appeal as to these process claims was merely a matter of policy, and of doubtful policy. As to the product claims, it could not appeal, because the decree was in its favor. It did not acquire any right of appeal, merely because Judge Sanborn used some reasoning which might

be applied to limit those claims in some later litigation with others.

As a result of this decree, plaintiff filed a disclaimer of all the claims for the glue base itself, and all those for the first process step. It further disclaimed from the second process step "any process of making glue excepting where this starch or starchy product, or carbohydrate subjected to the process, is degenerated to the extent described [in the patent], whereby the process results in the good as animal glue described" in said patent. The fair intent of this disclaimer as to the second step claims was, we should think, to limit them to a process where the material with which the process step begins is of the less than high viscosity indicated by the teachings of the patent to be necessary to produce the result at which the second process step was aimed. Such material might aptly have been called "degenerate." We see no fatal magic in the use of the participle, instead of the adjective. Certainly—as we think—in view of the fact that it was now being conceded that there was no novelty in the first step of its product, this disclaimer cannot be intended to confine the affected claims to a process based upon this abandoned first step product; this would be to build up patentable novelty upon a concession of no novelty. The reference was not to the base which had been degenerated *in the manner* specified in the patent,[4] but to one degenerated (or degenerate) *to the extent* so specified; and this must be interpreted in connection with the statement, remaining in the specification, that the second step could be practiced, and the ultimate product obtained, by commencing the second step with raw, untreated cassava starch.

Whether or not plaintiff was at the early date correct in this statement, it nevertheless demonstrates his theory of this patent; but, whatever the proper construction of this disclaimer, in our judgment it cannot in law have the effect of destroying the distinction between the process and product claims, and make the latter invalid so far as they do not imply the former. The absence of any effect upon product claims resulting from a disclaimer, which narrows method claims in the same patent, clearly follows from their mutual independence; there is no reason why there should be any such effect. The inventor of a new product need not take any process patent at all; the fact that he asks and is content with a modest method claim cannot make his product patent worse than if he were content to ask for no method pro-

tection whatever. The effect upon product patent of a process claim narrowness which comes from original issue and that which is achieved by disclaimer must be identical. A patentably new article does not necessarily involve any patentable process; merely putting ingredients together is not such a process. If it turns out that the process claim, as issued, omits some step which may or may not be essential, but which the patentee is willing to accept as a limitation, such acceptance by disclaimer seemingly cannot modify the separate grant of monopoly on the thing made. Goodyear's vulcanized rubber was a new thing, patentable as such. If his accompanying method patent had been found to be so broad that it might cover old methods, its correction by reissue or disclaimer could hardly have limited the product patent, the whole purpose of which was to get protection independent, as far as possible, of method limitation. For further comment on interrelation of method and product, see our opinion in Bishop v. Fulton, 17 F.(2d) 1006, filed March 7, 1927; to the effect that a disclaimer does not concede former invalidity, see Permutit Co. v. Wadhams (C. C. A. 6) 13 F.(2d) 454, 457; and that a specific disclaimer as to some claims does not affect the remaining claims, see Graham v. Earl (C. C. A. 9) 92 F. 155, 158; United States Co. v. Hewitt Co. (C. C. A. 7) 236 F. 739, 742; Robinson on Patents, vol. 2, § 650.

Subsequent cases came on for hearing in Western Michigan by Judge Sessions, and in Northern New York before Judge Cooper. These cases were based upon the product claims now in suit, and were directed against the same Kane base, made of raw cassava starch, now involved. The opinions of these judges are found in 279 F. 454, 457, and 458, and are in accordance with the views we have expressed, both as to the original merits, the interpretation of the Solva decision, and the disclaimer. The next case was heard by Judge Geiger, in the Eastern district of Wisconsin. 280 F. 728. He took the view that the Circuit Court of Appeals in the Solva Case intended to confine the claims for the ultimate product to one which had been produced by practicing both steps of the process successively, and, influenced apparently also by the thought that there could be no invention in using more or less water in some of the old processes which produced mucilage or paste, held that these product claims did not reach the use of the Kane base involved. A little later Judge Cooper's opinion was reviewed by the Second Circuit Court of Appeals. 287 F. 109. That court

---

[4] As was by error said in one of the later decisions.

adopted generally the same view expressed by Judge Geiger, and reached the same result. Still later Judge Geiger's opinion was affirmed by the Seventh Circuit Court of Appeals (292 F. 596), although it should be noted that the personnel of that court had entirely changed since the Solva decision, so that its interpretation of that decision was based only on the record. Thereupon Judge Sessions, in deference to these last two decisions, reconsidered his first decision in the present case, and as to the Kane base dismissed the bill.

With entire deference to the opinions of the Circuit Courts of Appeals of the Second and Seventh Circuits, we find ourselves unable to concur with them. Even if we could agree that their interpretation of the intent of the court in the original Solva opinion was right, we would still think that we ought not to reach the same result as they do, because in that event we would feel constrained not to follow the Solva decision.

The decree below is reversed, and the cause remanded for further proceedings in accordance with this opinion.